IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

Plaintiff,

v.                                                          Case No.  16-mj-5013-KGS

JAMES BARAY,                                    UNDER SEAL
FRANCISCO JAVIER GANDARILLA, and
CHAD KLEPPIN,

Defendants.

CRIMINAL COMPLAINT

I, Derek W. Maguire, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

COUNT 1

Beginning on a date unknown, prior to April 1, 2016, and continuing until May 2, 2016, in the District of Kansas and elsewhere, the defendants,

JAMES BARAY,
FRANCISCO JAVIER GANDARILLA, and
CHAD KLEPPIN,

did knowingly and intentionally combine, conspire, and agree, with each other, and with other persons whose identities are both known and unknown, to distribute and possess with intent to distribute more than 50 grams of methamphetamine, a Schedule II controlled substance, which quantity was reasonably foreseeable to each of them, in violation of Title 21, United States Code, Section 846, with reference to Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), and  Title 18 United States Code, Section 2.

1

## BACKGROUND

The following facts were made known to me by personal observation or from information which I received from other law enforcement officers and their reports, and/or from other individuals:

1. I am a Special Agent with the Drug Enforcement Administration, and have been for approximately 1 year. Prior to becoming a DEA Special Agent, I was employed as a police officer and narcotics detective with the St. Louis County, Missouri Police Department for approximately 8 years.

2. I have participated in numerous investigations involving complex criminal drug conspiracies, money laundering cases, airport and motel interdiction, and continuing criminal enterprises during my career. In connection with my official duties, I investigate criminal violations of the Controlled Substances Act as found in Title 18 and Title 21 of the United States Codes.  I have conducted and participated in numerous investigations pertaining to narcotics trafficking and I am familiar with the methods and routines of narcotics traffickers. In addition to this experience, I have received training and instruction from the Drug Enforcement Administration regarding the practices, methods, tools, and devices, customs and routines commonly used by persons engaged in drug trafficking. I have further participated in several seizures and forfeitures of property for its use in violation of the drug laws of the United States of America. During the course of these investigations, I have participated in all normal methods of investigation, including but not limited to electronic surveillance, questioning of witnesses and informants, pen register installations and wire intercept investigations. Participating in these investigations has provided me with extensive experiences in ascertaining the tactics employed by drug traffickers.

## PROBABLE CAUSE

3. DEA Topeka Post of Duty and the Topeka Police Department interviewed a subject, later assigned DEA CS-16-153326, who was arrested for a parole violation by the Topeka Police Department.  DEA CS-16-153326 (hereafter referred to as CS 1),

2

provided information regarding a methamphetamine source of supply CS 1 knows as "KC", later identified as James BARAY.

4. CS 1 stated he/she had been being supplied methamphetamine from BARAY for the last 6 months.

5. CS 1 stated he/she was provided approximately (6) six pounds of methamphetamine per week from a subject CS 1 knows as "KC" (later identified as James BARAY). CS 1 stated he/she pays approximately $9500 per pound for the methamphetamine and has been supplied by "KC" for the last six months.  CS 1 stated "KC" will "front" the methamphetamine to CS 1, as long as CS 1 pays for the prior week supply when picking up a new supply from "KC". CS 1 stated he/she does not know where "KC" lives because he/she has only met "KC" in public parking lots. CS 1 stated he/she has met "KC" on more than one occasion at a Wal-Mart parking lot in Kansas City, Missouri. CS 1 stated on some occasions, "KC" would not have the methamphetamine on hand, and would take CS 1's drug proceeds, and return to the meeting location 20-30 minutes later with the methamphetamine.

6. CS 1 provided a telephone number to Baray as 816-621-0889 and stated CS 1 and Baray mostly utilize the cellular phone application  "WHAT'S  APP"  and  "i-message" to talk, and do not utilize the traditional telephone or text feature of the service provider. CS 1 gave consent for TFO Hanika and Detective. Rodriguez to download all of the contents of CS 1's telephone.

   a. A download of CS 1's telephone provided the following exchange between CS 1 and BARAY, aka "KC" user of 816-621-0889:

      • **04/01/2016**-from Baray's phone to CS 1, approximately 4:11 p.m.:  "Aight cool, u gonna mind waiting a few for me to take em the money and get new ones? And how many new ones you want another 6?"

      "And how much paper u gonna have total?"

- **04/01/2016**-from CS 1 to Baray's phone, approximately 4:12 p.m.:  "I'll count it"

  "We still on for 830?"

  "I have 60 do I need more? That's 3 more than what's do"

- **04/01/2016**-CS 1 to Baray's phone, approximately 7:45 p.m.:

  "I'm on stand by bro and ready to head that way"

- **04/01/2016**- Baray's phone to CS 1, approximately 7:46 p.m.:

  "So 9 now"

- **04/01/2016**-CS 1 to Baray's phone, approximately 7:46 p.m.:

  "Was we getting a room this time or no?"

- **04/01/2016**- Baray's phone  to CS 1, approximately 7:46 p.m.:

  "I didn't get a room, I'm driving the shit straight over to them to get the next 6"

- **04/01/2016**-CS 1 to Baray's phone, approximately 8:31 p.m.:

  "Okay I'm looking at 920 and u name the place. Walmart? It's been awhile"

- **04/01/2016**- Baray's phone to CS 1, approximately 8:39 p.m.:

4

"Ok ya Walmart is cool"

- **04/01/2016**-CS 1 to Baray's phone, approximately 10:47 p.m.:

   "U by my car?"

   "U see me honking it?"

- **04/01/2016**- Baray's phone to CS 1, approximately 10:49 p.m.:

   "I found it"

   "It's in ur backseat behind u" "Six new ones"

- **04/02/2016**- Baray's phone to CS 1, approximately 12:52 p.m.:

   "Count came out good but was $100 off just FYI"

   b. TFO Hanika believes the above-listed messages between Baray's phone and CS 1 represent CS 1 being supplied with 6 pounds of methamphetamine by Baray on 04/01/2016. Further, Baray notifies CS 1 on 04/02/2016, that the count of drug proceeds was $100 off from the $60,000 USC CS 1 claimed to have ready for BARAY.

7. On 04-13-2016, TFO Kim Hanika secured a search warrant in the District of Kansas for the authorization to monitor the GPS location data of Baray's telephone 816-621-0889, reference court number 16-mj-5010-KGS.

8. On 04-15-2016, SA Kline confirmed through a law enforcement source that James Baray, the user of telephone 816-621-0889, and the subject identified by CS 1 as the

source of supply for methamphetamine to CS 1 is a sworn police officer currently employed by the Kansas City Kansas Public Schools Police Department.

9. On 04-19-2016, SA Chris Kline (acting in an undercover capacity) and CS 1 met in Topeka, Kansas and collected drug proceeds from three subjects. The drug proceeds were seized by DEA as trafficker directed funds (TDF) with the intention of those funds being relinquished to Baray for more methamphetamine.

    a. After completing the collection of drug proceeds, CS 1 contacted Baray by text message, as witnessed by SA Kline. SA Kline instructed CS 1 to tell Baray, when Baray contacts CS 1, that CS 1 could no longer meet with Baray to pick up methamphetamine, because of CS 1's recent arrest, and subsequent implementation of a GPS monitoring device on CS 1. CS 1 would be sending SA Kline (acting in an undercover capacity) to pick up the methamphetamine from Baray from now on.

    b. Due to CS 1 not being able to travel to Kansas City as part of CS 1's parole obligations with the State of Kansas, CS 1 stayed in Topeka, Kansas, and coordinated the contact between Baray and the undercover (SA Kline) from there.

    c. At approximately 5:30 p.m., Baray agreed to meet with the undercover (SA Kline) and supply SA Kline with 6 pounds of methamphetamine. CS 1 spoke with Baray by telephone and it was not recorded due to the fact CS 1 was with other people when Baray contacted CS 1.

    d. Baray told CS 1 to have the undercover (SA Kline) meet him (Baray) at the Wal-Mart on Boardwalk in Kansas City, Missouri. The Wal-Mart

6

was identified by investigators as being the Wal-Mart located at 8551 N. Boardwalk Ave., Kansas City, Missouri 64154. According to CS 1, this is a previously agreed upon meet location where CS 1 has been supplied methamphetamine by Baray, as recently as early April 2016.

e.  BARAY told CS 1 to have the undercover (SA Kline) at the Wal-Mart at 8 p.m.

f.  SA Kline (hereafter referred to as UC), and members of DEA surveillance team set-up at 8551 North Boardwalk Kansas City, Missouri (Wal-Mart).  SA Kline was outfitted with a covert listening/recording device for the purpose of officer safety and memorializing the drug transaction.

g.  At approximately 8:05 p.m., a black BMW (TARGET VEHICLE 1) pulled up next to the UC.  A subject exited the black BMW, matching the picture identified by CS 1 as Baray.  Baray entered the front passenger seat of the UC vehicle carrying a black shopping bag.

h.  Baray met with the UC and asked to see the concealed compartment in the UC vehicle.  The UC demonstrated how the non-factory concealed compartment operated to Baray.  The UC and Baray then engaged in small talk regarding the concealed compartment.  Baray then relinquished the black shopping bag to the UC.  Baray exited the UC vehicle and re-entered his black BMW (TARGET VEHICLE 1) and leave the area.

i.  Baray, operating Target Vehicle 1, was followed for a short-time away from the meet location, but could not be followed through the various shopping centers due to traffic congestion.

j.  At approximately 8:51 p.m., the black BMW (TARGET VEHICLE 1) was observed at 7802 N. Oregon Kansas City, Missouri. This address is the registered address for Baray and TARGET VEHICLE 1 according to the Missouri Department of Revenue.

10. On 04-20-2016, at approximately 8:30 a.m., IRS SA Jeff Thomas observed Baray enter TARGET VEHICLE 1 at 7802 N. Oregon Kansas City, Missouri, and drive to the area of I-635 and State Avenue Kansas City, Kansas, where SA Thomas lost sight of TARGET VEHICLE 1 due to the erratic driving of Baray.

11. On 04-20-2016, SA Kline received a response from an administrative subpoena served on the service provider of Baray's telephone 816-621-0889. SA Kline verified the telephone contacts between CS 1 and Baray which validated CS 1 information of Baray talking with CS 1 on Baray's identified telephone.

12. On 04-20-2016, SA Kline acting in an undercover capacity (hereafter referred to as UC) was contacted by Baray utilizing telephone 816-621-0889. Baray asked the UC if he/she could provide any drug proceeds to Baray for the drugs provided on 04-19-2016.

a.  **04-20-16** - Baray's phone to UC phone - "These dudes from MX putting the heat on to get why he owes tonight" SA Kline interpreted this text message to mean Baray's source wants to know why either the UC or CS

8

1 has not paid for the 6 pounds of methamphetamine picked up by the UC on 04-19-16.

b. The UC coordinated a meeting with Baray at the same Wal-Mart as the meeting between the UC and Baray on 04-19-2016. The UC was outfitted with a covert listening/recording device for officer safety and to memorialize the transaction.

c. At approximately 9:00 p.m., investigators established a pre-meeting surveillance. At the Target Location and at the Wal-Mart.

d. At approximately 9:45 p.m., SA Nicholas Wills and SA Jeff Thomas observed Target Vehicle 1 and Target Vehicle 2 leave in tandem from the Target Location and travel to the Wal-Mart.

e. At approximately 9:48 p.m., TFO Alan Doty advised that Target Vehicle 2 arrived at a parking lot adjacent to the Wal-Mart and established counter-surveillance. At the same time, Target Vehicle 1 was observed parking in the Wal-Mart parking lot.

f. At approximately 10:05 p.m., the UC pulled up next Target Vehicle 1. A Hispanic male exited the driver side and entered the passenger side of the UC vehicle. The Hispanic male was not Baray, but identified himself as "Javier" and identified himself as the "problem fixer" to the UC. The UC observed what the UC believes was a handgun in the front of "Javier's" pants with the grip protruding from the top of "Javier's" pants. "Javier" explained that the UC didn't want to see him ever, and he could make it a bad day, but "Javier" decided to work with the UC, and figure

9

out the debt owed to Baray by CS 1. "Javier" asked the UC if the UC brought "anything" with him/her? The UC interpreted that to be money (drug proceeds), and the UC stated he/she did have some money with him/her.

g. At approximately 10:24 p.m., TFO Doty advised that Target Vehicle 2 left its position in counter surveillance and pulled in behind Target Vehicle 1. Baray exited from the driver's seat of Target Vehicle 2. Baray walked over to the passenger window, and "Javier" rolled it down. Baray asked about CS 1, and if the UC can help fix the debt. The UC talked with Baray and "Javier" for approximately 15 minutes. At which time, the UC provided "Javier" with a white bag that contained the trafficker directed funds collected by the UC and CS 1 on 04-19-16. "Javier" asked how much it was and the UC stated "7", which meant $7000. Baray then stated CS 1 owed Baray $108,000 in drug proceeds. As the conversation ended between the UC, Baray, and "Javier", "Javier" asked for "that", and the UC interpreted "that" to be the money the UC stated he/she brought. The UC provided "Javier" with the money, and BARAY returned to the driver seat of the black Mercedes (TARGET VEHICLE 2), and "Javier" returned to the driver seat of the black BMW (TARGET VEHICLE 1). Surveillance followed both vehicles (TARGET VEHICLES 1 and 2) from the Wal-Mart parking lot back to 7802 N. Oregon Kansas City, Missouri, (Target Location) where both

10

Baray and "Javier" were observed exiting their cars and entering the residence.

h.  SA Kline verified through Missouri Department of Revenue that both vehicles are registered to Baray's home address of 7802 N. Oregon Avenue Kansas City, Missouri (Target Location).

i.  Based upon your affiants, training, experience, and knowledge of this investigation it is believed that because of Baray's exact knowledge on the drug debt owed to him (Baray) by CS 1 that Baray keeps drug ledgers to account for his profits and losses. It is further believed based on the point of origination and return on 04-20-2016, that those drug ledgers are store at Target Location and in Target Vehicle 1 and Target Vehicle 2.

13. On 04-20-2016, TFO Kim Hanika and Topeka, Kansas Police Detective Rodriguez met with CS1 to collect additional drug proceeds that were provided to CS1 from one of his/her former customers, "CeeJay." The United States Currency was placed inside evidence bags, pending an official count.

j.  On 04-21-2016, TFO Hanika transferred custody of the United States currency to TFO Alan Doty and TFO Matt Shull. An official count resulted in the determination that the collected trafficker directed funds were in the amount of $6,100.

14. On 04-21-2016, SA Kline visually identified "Javier" as being Francisco Javier Gandarilla. The identification came as a result of SA Kline viewing a "Wanted Persons" flyer that the Topeka Police Department possessed. Gandrilla was listed as fugitive from Beaver County, Oklahoma for rape.

15. On 04-22-2016, SA Kline, operating in an undercover capacity, communicated with Baray via recorded text messages. The result of the communication was the agreement to meet later that evening at the Wal-Mart Shopping Center located at 8551 N. Boardwalk Ave., Kansas City, Missouri 64154.

    a. At approximately 8:24 p.m., surveillance on the Target Location and the Wal-Mart was established.

    b. At approximately 8:55 p.m., Target Vehicle 1 arrived at the Wal-Mart and parked alongside the UC vehicle. SA Derek Maguire then observed Gandarilla exit Target Vehicle 1, walk over to the UC vehicle and smoke a cigarette. SA Kline additionally observed that Baray remained inside the vehicle. The UC, Baray, and Gandarilla then further discussed CS1's outstanding drug debt, and Baray informed the UC that his/her drug debt was clear and that they (Baray and the UC) remained on good terms. Baray then offered more methamphetamine to the UC, which was declined because the UC stated that he/she did not like to "mix paper and product." The UC then gave Baray the $6,100 of trafficker directed funds as well as an additional $3,000 of pre-recorded official advanced funds.

    c. At approximately 9:06 p.m., SA Maguire observed Gandarilla return to Target Vehicle 1.

    d. At approximately 9:11 p.m., SA Maguire observed Target Vehicle 1 leave the Wal-Mart in the direction of the Target Location. Approximately six minutes later, SA Thomas observed Target Vehicle 1 return to the Target Location.

12

16. On 05-01-2016, at approximately 1:40 a.m., SA Kline received a phone call from CS1's cellular telephone. SA Kline identified the voice on the phone as Baray, and a secondary voice as Gandarilla. During the call, Baray stated that they (Baray and Gandarilla) had CS1 with them and that they (Baray and Gandarilla) were trying to figure out who had the "dope" and where was the "money." SA Kline further overheard CS1 crying in the background, as though he was scared for his life. Gandarilla then assumed the primary position on the call and threatened to kill CS1 and cut up the body. Gandarilla then threatened SA Kline, who was acting in an undercover capacity, to locate his family and kill and cut them up as well. SA Kline then made the decision that there was imminent harm forthcoming to CS1 and informed Gandarilla that he (SA Kline) would give Gandarilla and Baray $75,000 on Tuesday, May 3, 2016 if they did not hurt CS1. The call then ended.

   a.  SA Kline then confirmed through the court authorized GPS tracker placed on Target Vehicle 1 that Target Vehicle 1 was in fact in Topeka, Kansas at CS1's residence.

   b.  SA Kline contacted Topeka Police Department to have an officer make contact with CS1 at his/her apartment. The responding Topeka Police Officer made contact with James Baray, Francisco Javier Gandarilla, Chad Kleppin, and CS1. Baray identified himself as a Police Officer and provided his law enforcement credentials. Kleppin also identified himself as a law enforcement officer but did not provide any credentials; Kleppin was immediately identified by officers as being armed with a handgun. Gandarilla was arrested on his warrant for rape out of Oklahoma.

13

c. Topeka Police Officers then requested Baray and Kleppin leave the area. Initially both Kleppin and Baray complied with the request of law enforcement. Topeka Police Officers did note that Kleppin returned to the area of CS1's apartment on two separate occasions and Baray did so on one other occasion.

d. At approximately 3:15 am, SA Kline and TFO Hanika responded to CS1's apartment and were unable to make contact with CS1 until approximately 5:40 a.m. SA Kline and TFO Hanika observed CS1 to have several head contusions and to be bleeding from head. CS1 was transported to the Topeka Police Department for treatment from EMS and a thorough debriefing by investigators.

e. At approximately 4:28 a.m., SA Wills, who was monitoring the GPS tracker on Target Vehicle 1, noted that Target Vehicle 1 had begun traveling eastbound on I-70 away from Topeka, Kansas. SA Wills continued to monitor the GPS tracking device until it arrived at the Great Wolf Lodge, in Kansas City, Kansas where it rendezvoused with Target Vehicle 2. Both Target Vehicle 1 and Target Vehicle 2 remained in the area of Great Wolf Lodge, until approximately 3:05 p.m. when GPS trackers placed on both vehicles appeared to be back at the Target Location.

f. During the debriefing, CS1 relayed the events that had occurred. CS1 stated that he drove over to an apartment complex in Topeka, Kansas to meet with an acquaintance and upon exiting the vehicle he was jumped by

14

three males. CS1 identified the three males through photographs as Kleppin, Gandarilla, and Baray. CS1 further stated that all three individuals were armed with handguns. CS1 stated that Kleppin tackled CS1, handcuffed CS1, and struck him several times in the parking lot of the apartment complex. Kleppin, Gandarilla, and Baray then placed CS1 into the rear of an unknown SUV. CS1 identified Kleppin as the driver, Baray as the front passenger, and Gandarilla in the rear passenger compartment with CS1 who was still handcuffed behind his back. CS1 then stated that while in the vehicle he continued to be struck by all three individuals until a short while, when CS1 was transferred to Target Vehicle 1, at which point CS1 was placed in the front passenger seat and Baray assumed the driving position. Gandarilla then situated himself behind CS1, CS1 stated that Gandarilla was wearing yellow gloves and had an unknown gun stuck to the back of CS1's head. CS1 stated that Target Vehicle 1 then followed Kleppin' s SUV, and communicated with Kleppin via Bluetooth speaker equipped in Target Vehicle 1. It was during this period of time that contact with SA Kline, who was able to negotiate CS1's release from Gandarilla, Baray, and Kleppin. CS1 then stated that he was returned to his apartment, where Gandarilla, Baray, and Kleppin further assaulted CS1 prior to Topeka Police Department's arrival.

g. Following the debrief, and equipped the knowledge that Gandarilla had been arrested without a gun, TFO Hanika and GS Dave Lenartowicz responded to CS1's apartment. A subsequent search yielded the discovery

15

the aforementioned yellow gloves and a handgun, which CS1 described to investigators as being used by Gandarilla.

h. CS1 stated that he had never met with Kleppin prior to this encounter, but stated that Kleppin appeared intimately aware of Baray's illicit dealings. GS Lenartowicz then relocated CS1 to temporary safe housing.

17.  Based upon observations made during surveillance, information received from the CS and the UC agents believe that probable cause exists that JAMES BARAY, FRANCISCO JAVIER GANDARILLA, and CHAD KLEPPIN  knowingly and intentionally combined, conspired, and agreed, with each other, and with other persons whose identities are both known and unknown, to distribute and possess with intent to distribute more than 50 grams of methamphetamine, a Schedule II controlled substance, which quantity was reasonably foreseeable to each of them, in violation of Title 21, United States Code, Section 846, with reference to Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), and Title 18 United States Code, Section 2.

The foregoing is true and correct to the best of my information and belief.

WHEREFORE, I respectfully request that an arrest warrants be issued authorizing the arrest of JAMES BARAY, FRANCISCO JAVIER GANDARILLA, and CHAD KLEPPIN for the aforementioned violation.

s/Derek Maguire

Derek Maguire
Special Agent DEA

16

Sworn to before me and subscribed in my presence this 2nd day of May, 2016, at Topeka, Kansas.

s/ K. Gary Sebelius

K. Gary Sebelius
United States Magistrate Judge
District of Kansas